**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ISRAEL LOPEZ,<br><br>       Plaintiff,<br><br>   v.<br><br>ERIC ARMSTEAD, *et al.,*<br><br>       Defendants. | 3:13-cv-00294-MMD-VPC<br><br>**REPORT AND RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE** |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants' motion for summary judgment (#36). Plaintiff opposed (#42), and defendants replied (#45). Having thoroughly reviewed the record and all papers, the court recommends that defendants' motion be granted.

### I.   FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Israel Lopez ("plaintiff") is an inmate in the custody of the Nevada Department of Corrections ("NDOC"). Presently, plaintiff is incarcerated at High Desert State Prison in Indian Springs, Nevada, but the events that precipitated this litigation occurred at Lovelock Correctional Center ("LCC") in Lovelock, Nevada. Acting *pro se*, and as allowed by the Court's screening order (#3), plaintiff asserts several civil rights claims under 42 U.S.C. § 1983 against the following NDOC officials: LCC Sergeant Eric Armstead ("Armstead"); LCC Sergeant Paul Simms ("Simms"); LCC Warden Robert LeGrand ("LeGrand"); and Ely State Prison ("ESP") Associate Warden Harold Byrne ("Byrne"). (#5 at 1-3; #3 at 1-4.) Plaintiff seeks compensatory and punitive damages, costs, and declaratory relief for claims arising under the Fourteenth and Fifth Amendments. (*Id*. at 5-12.)

The underlying events in this case involve theft and the punishment that resulted therefrom. On August 26, 2011, plaintiff accompanied his cellmate, Hernandez, to the LCC property room. (*Id.* at 5.) Plaintiff avers that, as he and Hernandez awaited their turn at the window, and when the property room officer, Senior Correctional Officer Tim Garrett ("Garrett"), left the immediate vicinity of the window, an inmate ahead of the two, Gastelum, jumped through the window and stole an envelope containing United States postal stamps in the value of $35.97. (*Id.*; #36 at 3.) Plaintiff insists that neither he nor Hernandez participated in the theft. (#5 at 5.) Defendants intimate, in contrast, that plaintiff and Hernandez were alone in the property room prior to the theft; Gastelum entered the room following their arrival. (*See* #36 at 3.)

In either case, Gastelum jumped through the property room window and stole the stamps. Gun Post Officer Tatem ("Tatem") viewed the theft as it occurred via live-feed security camera footage. (*Id.*; #36 at 3.) He immediately telephoned Garrett, who then called other prison staff and instructed them to search the three inmates, each of whom had departed the property room. (#36 at 3.) When prison staff stopped and searched each inmate, they discovered the stolen stamps upon Gastelum's person. (#5 at 5-6.) Tatem also contacted Armstead to report the theft. (*Id.*) Armstead reviewed the surveillance footage, identified the three inmates, and concluded that they had acted together to steal the stamps. (*Id.*) Accordingly, all three inmates were placed in administrative segregation, and plaintiff received a notice of charges for a disciplinary violation, theft, on August 30, 2011. (*Id.*) Plaintiff pled not guilty and identified Gastelum as a witness to testify as his upcoming disciplinary hearing. (*Id.*)

On September 22, 2011, Simms held a disciplinary hearing to consider the charge against plaintiff. (*Id.*; #36 at 4.) Simms reviewed the surveillance footage prior to the hearing. (#36 at 4.) At the hearing, Simms declined to provide the footage to plaintiff at the hearing or review it at that

time. (#5 at 6.)  Simms stated that the video depicted plaintiff assisting the theft by acting as a lookout for Gastelum. (*Id.*)  Plaintiff then attempted to call Gastelum as a witness, but Simms denied his request. (*Id.*; #36 at 4.)  Thereafter, Simms found plaintiff guilty of the charge. (#5 at 6; #36 at 4.)  Plaintiff was, initially, sentenced to a suspended sentence of 60 days of disciplinary segregation and restitution. (#5 at 6.)  Several days later, however, he received a modified sentence, which imposed the segregation sentence upon the revocation of probation stemming from a prior disciplinary violation. (*Id.*)

Several days later, plaintiff appealed the conviction in an inmate grievance, and he also appealed the related probation revocation. (*Id.* at 6-7.)  On October 3, 2011, LeGrand denied his grievance regarding the hearing's procedures on the basis that the charge was supported by evidence and Simms had respected due process requirements. (*Id.*)  On October 18, 2011, Byrne rejected as untimely plaintiff's contest of the probation revocation. (*Id.*)  Plaintiff's further appeals failed. (*Id.*)  At some point, he was transferred to ESP to serve the segregation sentence. (*Id.* at 7.)  As a result of the sentence and his increased custody classification, plaintiff alleges that the Nevada State Parole Commission denied him parole in January 2012. (*Id.* at 7-8.)

For these events, plaintiff brings three counts under the Fourteenth and Fifth Amendments. In essence, plaintiff alleges against all defendants various violations of his procedural due process rights.  Specifically, plaintiff's theories are that Armstead violated his rights by falsely accusing him of the theft in the investigative report; and Simms so violated by denying his request to call Gastelum, failing to produce the surveillance video, and convicting him with no evidence but Armstead's report. (*Id.* at 8-9.)  Additionally, Armstead and Simms violated his rights because they "should have known" that their actions would lead to his later parole ineligibility. (*Id.*)  His claims

against LeGrand and Byrne stem from their denials of his separate appeals, which thereby failed to rectify the purported due process violations in the underlying hearing. (*Id.* at 11-12.)

## II.   LEGAL STANDARD

Summary judgment allows the court to avoid unneeded trials. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court properly grants summary judgment when the record discovered by the parties demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Id.* Therefore, conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). At this stage, the court's role is to verify that reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *See Schmidt v. Contra Costa Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

Summary judgment proceeds in burden-shifting steps. When the moving party bears the burden of proof at trial, it must support its motion "with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation omitted). By contrast, a moving party who does not bear the burden of proof "need only prove that there is an absence of evidence to support the non-moving party's case[,]" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

2010), and such a party may additionally produce evidence that negates an essential element of the nonmoving party's claim or defense, *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts. *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the nonmoving party must "designate specific facts demonstrating the existence of genuine issues for trial. This burden is not a light one." *In re Oracle Corp.*, 627 F.3d at 387 (internal citation omitted). "The non-moving party must show more than the mere existence of a scintilla of evidence. . . . In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (internal citations omitted). The nonmoving party may defeat the summary judgment motion only by setting forth specific facts that illustrate a genuine dispute that requires a factfinder's resolution. *Liberty Lobby*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. Although the nonmoving party need not produce authenticated evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as to the material facts" will not defeat a properly-supported and meritorious summary judgment motion, *Orr*, 285 F.3d at 783.

### III.   DISCUSSION

**A.   Civil Rights Claims Under § 1983**

42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067

(9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)). The statute "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and is "merely . . . the procedural device for enforcing substantive provisions of the Constitution and federal statutes," *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Claims under § 1983 require the plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official who acts under the color of state law. *Warner*, 451 F.3d at 1067. Further, to prevail on a § 1983 claim, the plaintiff must establish each of the elements required to prove an infringement of the underlying constitutional or statutory right.

**B.     Fourteenth Amendment Claims**

Procedural due process claims under the Fourteenth Amendment entail two components. First, the court must determine that the plaintiff possessed a constitutionally protected interest, such that due process protections apply. Second, and if so, the court must compare the level of due process the circumstances demanded, and also the due process that the defendants provided. A claim lies only where the plaintiff has a protected interest, and defendants' procedure was constitutionally inadequate.

**1.     Protected Liberty Interests**

The Fourteenth Amendment of the U.S. Constitution guarantees all citizens, including inmates, due process of law. However, the Constitution protects only certain interests with the guarantees of due process. Therefore, an inmate's right to procedural due process arises only when a constitutionally protected liberty or property interest is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Such interests may arise from the Constitution itself or from state law. Under the Due Process Clause, an inmate does not have liberty interests related to prison officials' actions that fall

within "the normal limits or range of custody which the conviction has authorized the State to impose." *Sandin v. Conner*, 515 U.S. 472, 478 (1995) (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). Thus, the Clause contains no embedded right to remain in a prison's general population. *Id*. at 485-86. As the Ninth Circuit has explained, "[o]nly the most extreme change in conditions of confinement have been found to directly invoke the protections of the Due Process Clause . . . ." *Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013); *see also Kirk v. Foster*, No. 3:13-cv-00296-RCJ-WGC, 2014 WL 6792028, at *13 (D. Nev. Dec. 1, 2014) (collecting cases). At bottom, the Constitution directly protects an exceedingly limited number of interests within the prison context.

State law also may create liberty interests that the Constitution protects with due process. Where segregated housing or other prison sanctions "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]" due process protections arise. *Sandin*, 515 U.S. at 483-84. What matters is not the particular label or characterization of the segregation or sanction, but instead, its underlying nature: "[n]o matter how a prisoner's segregation (or other deprivation) is labeled by the prison or characterized by the prisoner, a court must examine the substance of the alleged deprivation and determine whether it constitutes an atypical and significant hardship . . . ." *Hernandez v. Cox*, 989 F. Supp. 2d 1062, 1068-69 (D. Nev. 2013).

When conducting the atypical-hardship inquiry, courts examine a "combination of conditions or factors . . . ." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996). These include: (1) the extent of difference between segregation and general population; (2) the duration of confinement; and (3) whether the sanction extends the length of the prisoner's sentence. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing and discussing *Sandin*, 515 U.S. at 486-87). That a particular punishment or housing placement is more restrictive than administrative segregation or general

population privileges is, alone, not enough: even where "the conditions in segregation are worse than those a prisoner will typically encounter in prison, the Court must still consider whether the conditions are extreme enough in nature and duration or whether they will necessarily affect the length of a prisoner's sentence." *Hernandez*, 989 F. Supp. 2d at 1069. Under the third factor, the Supreme Court has held that a loss of prospective work or good-time credits, even where such credits may ultimately effect an earlier release, is "too attenuated" to support the conclusion that officials have lengthened an inmate's sentence. *See Sandin*, 515 U.S. at 487.

On several occasions, courts have applied the *Sandin* factors to segregated confinement. A court in this District has held that placement in more restrictive housing following a disciplinary sentence, even where part of the placement related to the prison's search for appropriate post-sentence housing, could constitute atypical hardship. *See Parra v. Skolnik*, No. 3:11-cv-00913-LRH-WGC, 2013 WL 5428473, at *8-9 (D. Nev. July 1, 2013). Yet the weight of authority reaches the contrary conclusion—that segregated housing is rarely sufficiently severe to create a liberty interest. Indeed, as the Ninth Circuit has remarked, "it would be difficult . . . to make disciplinary segregation sufficiently more restrictive than the conditions of general population . . . to count as an atypical and significant deprivation of liberty . . . ." *Serrano*, 345 F.3d at 1078 (citation omitted). Only where the terms of segregated confinement are extreme—for example, indefinite solitary confinement that necessarily entails the loss of parole eligibility—have most courts found that liberty interests might arise. *See Wilkinson*, 545 U.S. at 224; *see also Brown v. Ore. Dep't of Corrs.*, 751 F.3d 983, 988 (9th Cir. 2014) (finding that a liberty interest arose where an inmate was in solitary confinement for twenty-three hours per day, with nearly no interpersonal contact and a denial of most privileges afforded to those in the general population).

The court concludes that defendants are entitled to summary judgment because plaintiff lacked a liberty interest in avoiding disciplinary segregation and transfer to ESP. Under the Due Process Clause itself, no liberty interest arises in these actions. *Sandin*, 515 U.S. at 485-86; *Meachum*, 427 U.S. at 225. Similarly, plaintiff has no state-created liberty interest in avoiding transfer or disciplinary segregation, for the court concludes that these punitive sanctions were not atypical hardships under *Sandin*.

First, the difference between segregation and general population privileges at ESP is not significant. General population inmates at ESP are allowed one hour each day to shower and use the amenities of the recreation yard. (#36-9 at 3.) They may possess certain personal property, borrow books from the institutional library, use the telephone, purchase items from the prison canteen, and receive visitors on two days each week. (*Id*.) They also may attend religious services and programs, clean their cells with provided supplies, access laundry services, and eat the same meals as other ESP inmates. (*Id*.) Inmates held in segregation at ESP are able to possess legal mail and materials, possess personal property in identified quantities, purchase items from the prison canteen, receive daily visits from correctional staff and healthcare providers, and shower. (*Id*. at 4-5.) Those held in segregation in excess of sixty days are also eligible for programming. (*Id*.) In short, segregation is somewhat more restrictive in terms of movement and privileges, but not extraordinarily so in light of ESP's restrictive, maximum-security nature. Thus, the first *Sandin* factor does not support an atypical hardship finding. *Serrano*, 345 F.3d at 1078.

Second, plaintiff served only fifty-six days in segregation before returning to general population, albeit at ESP. (*Id*. at 3.) The court believes that this relatively short duration in segregation also weighs against a hardship finding. *Serrano*, 345 F.3d at 1078. In contrast to his sentence, many disciplinary violations in NDOC institutions entail segregation periods as long as

twenty-four months.  (*See id*. at 4.)  Third, plaintiff's stay in segregation did not lengthen his incarceration; this, too, dissuades the court from finding an atypical hardship.  *Serrano*, 345 F.3d at 1078.  The court is mindful that plaintiff asserts that he lost good-time credits and also parole eligibility as a result of the sentence and transfer.  (#42 at 5, 14.)  Yet this is an insufficient showing under the third factor.  *See Sandin*, 515 U.S. at 487.

Plaintiff's opposition does not demonstrate that there is a genuine issue of material fact as to the conditions of segregated confinement, from which a liberty interest might arise.  He points to three exhibits filed in his opposition of evidence of hardship: an emergency grievance, and two kites pertaining to his eye glasses and examination with an optometrist.  (#42 at 5.)  As a preliminary matter, the documents are insufficient to demonstrate a genuine dispute, for they present only plaintiff's bare allegations about the conditions.  Moreover, each is inapposite for the following reasons.  The grievance pertains to property that plaintiff may have lacked while being held in administrative segregation prior to his transfer to ESP; therefore, these allegations do not reflect the terms and conditions of his disciplinary confinement.  As to the kites, even assuming, *arguendo*, that plaintiff's allegations in these documents are true, they do not speak to the terms and conditions of segregation.  The kite pertaining to an optometrist appointment is dated August 13, 2012; plaintiff's time in segregation expired in March.  (#42 at 31; #36-9 at 4.)  That plaintiff may not have been immediately schedule for an eye appointment during his segregation sentence can hardly be said to be an atypical hardship, for inmates receive immediate medical attention only in emergency circumstances.  Similarly, his eyeglasses kite makes plain that the prison did not withhold the same, for he had not yet been prescribed glasses.  Plaintiff kited on June 26, 2012, after segregation concluded, to inquire about eyeglasses that, by the grievance's own text, had not yet been

provided—because, in fact, an optometrist had not yet examined him. (*See* #42 at 33.) Accordingly, it cannot be said that the allegations pertaining to eye care were part of his disciplinary segregation.

Because the evidence to which plaintiff points in support of his assertion that his confinement imposed hardships do not speak to its conditions, he has failed to carry his burden of demonstrating that factual issues remain. Defendants' evidence conclusively demonstrates that plaintiff's disciplinary segregation sentence was not an atypical hardship. Therefore, plaintiff lacked a cognizable liberty interest under the Fourteenth Amendment. His claims necessarily fail.

**2.     Requirements of Due Process**

Upon concluding that a protected liberty or property interest is at stake, the court then considers whether prison officials have adhered to the due process requirements. "[A] prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime . . . ." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). In prison disciplinary proceedings, "due process requires that the inmate receive: (1) written notice of charges; (2) at least twenty-four (24) hours between the time the prisoner receives the written notice and the time of the hearing, so that the prisoner may prepare his defense; (3) a written statement by the hearing officer of the evidence relied upon and the reasons for taking disciplinary action; (4) the right of the prisoner to call witnesses in his defense, when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals; and (5) legal assistance if the prisoner is illiterate or the issues presented are legally complex." *Kirk*, 2014 WL 6792028, at *15 (citing *Wolff*, 418 U.S. at 564-71). Yet the inmate's rights are not unfettered; due process protections must necessarily accommodate the prison's legitimate institutional needs. *Bostic v. Carlson*, 884 F.2d 1267, 1269-70 (9th Cir. 1989) (citing *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)); *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) ("When prison official's limit an inmate's efforts to defend himself, they must have a legitimate penological

reason."). In particular, prison officials may "deny a defendant the right to call redundant and unnecessary witnesses," so long as the prison adequately articulates and proves its justification for doing so. *Bostic*, 884 F.2d at 1273-74.

Additionally, the hearing officer's decision must be based upon "some" evidence. *Castro v. Terhune*, 712 F.3d 1304, 1307 (9th Cir. 2013) (citing *Hill*, 472 U.S. at 455). The showing required by this standard is "minimally stringent," *id.* at 1314 (quoting *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994)), and the court is not to "examine the entire [underlying] record, independently assess witness credibility, or reweigh the evidence," *id.* (citing *Bruce v. Yist*, 351 F.3d 1283, 1287 (9th Cir. 2003)). Stated differently, as long as prison officials relied on some evidence, the court shall not substitute its view of the facts under the guise of scrutinizing procedure; the court is limited to verifying that the decision had some basis, even if the court might reach a contrary determination had it been presented with the evidence in the first instance.

The court recommends summary judgment for defendants on the Fourteenth Amendment claims on the alternate basis that they provided to plaintiff all due process the Constitution demanded. First, plaintiff received a notice of charges well in advance of his hearing. (#36-4 at 2; #5 at 6); *Kirk*, 2014 WL 6792028, at *15. Second, upon Simm's adverse decision on the theft charge, plaintiff received a written statement identifying the evidence upon which Simms relied. (#36-5 at 2-4); *Kirk*, 2014 WL 6792028, at *15. The court recognizes that the form does not contain plaintiff's signature as evidence of his receipt, but plaintiff does not contend in his complaint or opposition that he never received the written statement. (#5 at 6; #42 at 3-8.)

Third, Simm's refusal to allow plaintiff to call Gastelum as a witness was constitutionally permissible. The Ninth Circuit has long permitted prison officials to deny to inmates testimonial witnesses when their attestations would be redundant. *Bostic*, 884 F.2d at 1273-74. The burden

upon defendants is to articulate and prove this justification. *Id.* Here, defendants have met this burden; the written decision indicates the ground for denying Gastelum's testimony. (#39-5 at 2.) In fewer words, the decision indicates that Gastelum would have corroborated plaintiff's statement that Gastelum acted in alone in committing the theft, and that plaintiff took no part as a lookout. (*Id.*)

In his opposition, plaintiff attempts, but fails, to argue that the testimony was not redundant because Simms misunderstood the facts to which Gastelum would have testified. Plaintiff contends that he sought Gastelum's testimony because he would have stated that he acted alone, without plaintiff's assistance—i.e., the exact reason Simms provided in his written decision. (#42 at 3.) Plaintiff divines, however, a different reason from Simm's explanation. Apparently, by the decision's exact words, "he [plaintiff] was not there with him [Gastelum]" (#36-5 at 2), plaintiff believes that Simms regarded the content of Gastelum's testimony as concerning plaintiff's non-presence in the property room at the time of the theft (#42 at 3). This wordplay lacks merit. It is plain from the decision that Simms understood that plaintiff sought Gastelum's testimony of plaintiff's non-involvement—which, thereby, would corroborate plaintiff's continued position that Gastelum acted alone. (*See, e.g.*, #5 at 5-6; #36-5 at 2; #42 at 3.) Accordingly, Simms properly concluded that the testimony would be duplicative, and permissibly denied plaintiff's witness request. *Bostic*, 884 F.2d at 1273-74.

Finally, the court confidently concludes that Simms reached his decision upon evidence that surpasses the minimal "some evidence" standard. *Castro*, 712 F.3d at 1307. Simms relied upon Armstead's statement in the notice of charges, and also the video of the property room surveillance camera. (#36-1 at 2-3; #36-4 at 2; #36-5 at 2-3; #33.) Simms interpreted the video footage, and his interpretation thereof and reliance thereupon satisfies due process requirements. Plaintiff may disagree with the decisions Simms reached, but this court shall not reinterpret the evidence and

displace his judgment under the guise of due process. *See Castro*, 712 F.3d at 1307. Further, plaintiff's view that defendants denied him due process by failing to provide the video and declining to review the footage at the hearing also lack merit. First, the prison's refusal to provide surveillance footage to plaintiff is a policy designed to ensure institutional security (#36-2 at 2), which is a legitimate penological interest. *Bostic*, 884 F.2d at 1269-70; *Koenig*, 971 F.2d at 423. Second, the hearing officer is not constitutionally obligated to review the video at the hearing when he relies upon it. *See Alexander v. Schleder*, 790 F. Supp. 2d 1179, 1187 (E.D. Cal. 2011) ("no United States Supreme Court case has held that in a prison disciplinary hearing, a prisoner is entitled to have the [hearing officer] personally review videotape evidence.").

Accordingly, even if defendants owed plaintiff the protections of due process, they complied with any and all applicable requirements. Plaintiff's opposition has identified no issues of fact that remain as to the process defendants provided. His arguments regarding witness testimony and production of video fail for the reasons above described. The court, therefore, recommends that summary judgment be granted to defendants on the Fourteenth Amendment claims. Neither Armstead nor Simms violated plaintiff's due process rights, and as such, no basis exists for finding LeGrand or Byrne liable for their failure to "rectify" the constitutionally adequate proceeding below.

**C.    Fifth Amendment Claims**

The court also recommends summary judgment on the Fifth Amendment claims. First, plaintiff articulates no specific Fifth Amendment claims (*see* #5 at 5-12), such that this court can determine that these claims are anything but the same due process theories that the court has already reviewed. Second, the Fifth Amendment is inapplicable to state and local officials. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001). As plaintiff's case pertains to only state prison officials, any claims under the Fifth Amendment necessarily fail.

## IV.     CONCLUSION

Based upon the foregoing, and for good cause appearing, the court concludes that, with respect to his due process claims, plaintiff lacked a liberty interest that required due process protections. In addition, defendants provided all process due to plaintiff; therefore, defendants are entitled to summary judgment.

The parties are advised:

1.     Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.     This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V.     RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#36) be **GRANTED**;

**IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** and close this case.

**DATED:**   February 23, 2015.

_____
**UNITED STATES MAGISTRATE JUDGE**